**PARK TUCSON INVESTORS LIMITED PARTNERSHIP, Plaintiff,**

v.

**Cosmo ALI and Anna Ali, husband and wife, Defendant.**

**And related cases.**

**No. Civ. 90–694 PHX RCB.**

United States District Court, D. Arizona.

May 22, 1991.

Susan Ferrell, Stompoly & Stroud, P.C., Tucson, Ariz., for plaintiff Resolution Trust Corp.

Tom Slutes, Slutes, Sakrison, Even, Grant & Pelander, P.C., Tucson, Ariz., for defendants/counterclaimants.

Jeffrey H. Greenberg, Fioramonti & Greenberg, P.A., Tucson, Ariz., for defendants Toumey & Wystrach.

## ORDER

BROOMFIELD, District Judge.

Plaintiff, the Resolution Trust Corporation ("RTC") as Receiver for MeraBank Federal Savings Bank ("MeraBank") moved for summary judgment. Defendants/Counterclaimants responded, cross-moved for summary judgment and for partial summary judgment. The court heard oral argument on May 20, 1991 and now rules.

### I. FACTS

This lawsuit is the consolidation of eighteen separate actions, which involve the same series of transactions. The RTC, as Receiver for MeraBank, seeks to enforce seventeen promissory notes executed by the defendants. The promissory notes were given to the Bank as collateral for a loan, now in default. The makers of the notes have filed third party complaints against the original holders of the notes and against MeraBank.

During 1985, Michael Wystrach and Merle Toumey organized a limited partnership, Hotel Park Tucson Limited Partnership ("HPTLP"), and the general partners were Toumey and Wystrach, along with Paragon Hotel Corporation and William Eddins. While the hotel was under construction, HPTLP sold fifty percent of its interest to another limited partnership, Park Tucson Investors Limited Partnership ("PTILP"), whose general partners were also Messrs. Wystrach, Toumey, Eddins and Paragon Hotel Corporation. Messrs. Wystrach, Toumey and Eddins sold limited partnership "units" in a private placement offering in 1985. Each unit cost $55,000, $10,000 of which was to be paid upon purchase and the other $45,000 was paid in the form of a promissory note, entitled "Investor Note."

The Investor Notes provide, *inter alia,* that they may be assigned to any holder with full recourse against the maker, and that upon default the maker's interest in PTILP may be sold and that the maker would be liable for any deficiency balance.

In October 1985, Messrs. Wystrach and Toumey, along with Grace Wystrach (Michael's wife) gave First Federal Savings Bank of Arizona (later to become Mera-Bank) a joint promissory note for $945,000. The note, along with the accompanying Security Agreement, granted the bank all of the Wystrachs' and Toumey's interest in the Investor Notes.

The parties agree on the crucial series of events:

1. PTILP assigned the Investor Notes to HPTLP. The notes were not indorsed by the payee, PTILP. An "Assignment of Investor Promissory Notes" was executed, assigning "all those investor promissory notes listed on Exhibit 2 hereto." No "Exhibit 2" was attached.

2. HPTLP then assigned the Investor Notes to James Brophy, Merle Toumey and Michael Wystrach. These notes were also not indorsed. An "Assignment of Investor Promissory Notes" in favor of Brophy, Toumey and Wystrach was executed, assigning "all those investor promissory notes listed on Exhibit 2," and stating that it was to be "in the percentages set forth as [sic] Exhibit 1 hereto." Neither Exhibit 1 nor Exhibit 2 were attached to the assignment, which purportedly would have stated which Investor Notes were assigned and in what percentages to Brophy, Toumey and Wystrach.

3. Although Mr. Brophy did not execute any assignment of his interest, the Wystrachs and Toumey executed a "Security Agreement," assigning the Notes to the Bank as collateral for the $945,000 loan. These Notes again were not indorsed.

The Wystrachs and Toumey defaulted on their obligations under the Note, failing to make payments when due. The bank declared a default and interest continues to accrue. The Investor Notes, which the bank seeks to enforce in the instant action, all matured on July 1, 1990. The defen-

dants/counterclaimants claim that the notes were procured by fraud by the principals of PTILP.

The RTC maintains that, as a matter of law, the Investor Notes are enforceable by the RTC free from any defenses raised by the investors. The defendants/counterclaimants seek judgment in their favor on the ground that the RTC does not own or have any title or interest in the promissory notes it is suing on. Moreover, defendants move for partial judgment seeking a determination (1) that neither the *D'Oench, Duhme* doctrine nor 12 U.S.C. § 1823(e) bar their defenses and counterclaims; (2) that plaintiff is pursuing an incorrect remedy by suing on the Notes rather than foreclosing the security interest; and, finally, (3) that defendants' liability is limited to any deficiency remaining after the sale of their units.

## II. DISCUSSION

### A. *Summary Judgment Standard*

To grant summary judgment, the court must hold that the record clearly establishes "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In determining whether to grant summary judgment, the facts and inferences from these facts are viewed in the light most favorable to the non-moving party and the burden is placed on the moving party to establish both that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Matsushita Electric Industrial Co., v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538, 551–53 (1986).

### B. *Analysis*
#### 1. The RTC's Interest in the Investor Notes

■ Defendants cross-move for summary judgment, arguing that the RTC has no title or interest to the notes that it is suing on and, therefore, has no right to bring suit. Defendants point out the prob-

lems with and the irregularities on the Notes' assignments.

First, the payee on all the Investor Notes is PTILP. PTILP then executed an instrument, entitled "Assignment of Investor Promissory Notes," purporting to assign to HPTLP all of the Investor Notes listed on "Exhibit 2." No exhibit, however, was attached. A MeraBank officer, Karen Burns, stated in her deposition that she had no knowledge of the exhibit. Moreover, defendants were unable to find the exhibit within MeraBank's files.

Second, HPTLP executed a similar "assignment," in favor of Brophy, Toumey and Wystrach. Again, the Investor Notes listed on "Exhibit 2" were to be assigned, but no Exhibit 2 was attached or can be found in MeraBank's files. Moreover, the Notes were purportedly assigned in the percentages listed in the attached "Exhibit 1," which was also missing. Therefore, defendants contend that there is no way to ascertain what percentages of what Notes were assigned to each of the three assignees. This is problematic, as Brophy did not assign to MeraBank or grant it a security interest in any of the Notes.

Third, none of the Investor Notes were ever indorsed by the payee or anyone else. Defendants contend that plaintiffs are unable to prove what notes, if any, and in what percentage, were assigned to the Bank. Thus, the Notes were not assigned nor negotiated pursuant to the Uniform Commercial Code ("U.C.C."). Ariz.Rev. Stat.Ann. ("A.R.S.") §§ 47–3201 and 47–3202.

Plaintiff contends that there are no serious problems with the assignments. It is undisputed that the RTC has possession of the seventeen original Investor Notes. Brophy assigned all his interest in the Investor Notes to Toumey and Wystrach. The Security Agreement, executed by Toumey and Wystrach to the bank, lists the notes, the makers and the principal amount of each note. Plaintiff's reply includes an affidavit by Toumey and exhibit, which detail the assigned Notes and explain that they were assigned by HPTLP in the following percentages: Michael Wystrach 46⅔%, Merle Toumey 46⅔%, and James Brophy 6⅔%.

Plaintiff maintains that its right to sue on the Notes is determined by the U.C.C. It argues that "title" to the Notes is immaterial, *see* A.R.S. § 47–9202, as the RTC has an enforceable security interest.

A.R.S. § 47–9203 provides the requirements for an enforceable security interest. That section states that a security interest "attach[es]" and is "enforceable against the debtor or third parties" when:

1. The collateral is in the possession of the secured party pursuant to agreement ...; and

2. Value has been given; and

3. The debtor has rights in the collateral.

*Id.*, § 47–9203(A).

First, the RTC has possession of the original Investor Notes. Second, they were given to MeraBank for value and pursuant to agreement, as collateral for the $945,000 loan. Finally, Toumey and the Wystrachs had rights in the Notes when they were assigned to MeraBank. Thus, plaintiff argues that its security interest in the Notes has attached and is enforceable against the "debtor," which includes Toumey, the Wystrachs and the defendants. Plaintiffs claim that defendants are included in the U.C.C.'s definition of debtor:

[T]he person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral.... Where the debtor and the owner of the collateral are not the same person, the term "debtor" means the owner of the collateral in any provision of the article dealing with the collateral, the obligor in any provision dealing with the obligation, and include both where the context so requires.

A.R.S. § 47–9105(A)(5). Plaintiff contends that the defendants, makers of the Notes, are "debtors" as defined by the U.C.C. because they are the obligors under the Notes.

The defendants' reply disagrees. First, defendants maintain that the assignments were faulty and plaintiff has the burden of

proving that they have the right to sue on the Notes. Defendants also raise an interesting conflict: on one hand, the RTC claims that the *D'Oench, Duhme* doctrine and § 1823(e) bar any evidence of secret, undocumented agreements and, on the other hand, the RTC attempts to establish its interest to the Notes through an undocumented agreement (or attachment, thereto) between the Bank and Mr. Toumey, detailing the assignment. Second, defendants dispute plaintiff's interpretation of "debtors," with reference to A.R.S. § 47–9105(A). Defendants contend that the plain meaning of the statute is that the definition of a "debtor" is any person who owes money under the secured obligation—in this case, Toumey and the Wystrachs—and anyone who provides collateral to secure the debt. Only Toumey and the Wystrachs can be defined as "debtors," under the statute, as they are both the obligors and the parties pledging the collateral, according to defendants.

The court finds that plaintiff has a secured interest in the Investor Notes, allowing them to sue defendants. Although the assignments were problematic, despite plaintiff's arguments to the contrary, defendants do not point the court to any authority providing that faulty assignments would void or invalidate plaintiff's interest in the Notes. Clearly, plaintiff has an interest in the Notes, as they are collateral for a $945,000 loan. Defendants fail to point out the legal significance of the lack of indorsements or the missing "Exhibit[s]." Moreover, plaintiff meets the requirements of A.R.S. § 47–9203. Defendants are "debtors," within the meaning of § 47–9105(A)(5), as they owe payment and are the obligors under the Notes' obligations. Defendants do not explain why the participation of Toumey and the Wystrachs (or the assignments of the notes to them) would preclude the enforcement of the obligations of the makers of Notes. Furthermore, the court construes defendants as "third parties" under A.R.S. § 47–9105(A)(5) and the Notes are enforceable against them. Defendants' motion for summary judgment is, therefore, denied.

## 2. Foreclosure

■ Next, defendants argue that even if plaintiff is the assignee of the Investor Notes, it must first foreclosure its security interest to achieve holder status. The Security Agreement, between Toumey, the Wystrachs and the Bank, indicates that the Notes are being assigned to the bank as security for the payment of the promissory note. Therefore, the bank is not owner of the security until it is disposed of in accordance with Article 9 of the U.C.C.

Defendants point to provisions within the Security Agreement, which purportedly require foreclosure. Exhibit C, Plaintiff's Statement of Facts. Paragraph Five, entitled "Rights and Remedies," states that the Bank has all the remedies of a secured party under the U.C.C. and certain additional rights set forth in other provisions of the agreement. Subparagraph D provides that MeraBank may retain the collateral in satisfaction of the obligations secured under the agreement, providing they send written notice of the election to the debtor. Defendants contend that MeraBank would have had to write to Toumey and the Wystrachs and explain that they were electing to keep the notes in satisfaction of the debt and, at that point, MeraBank would own the interest that Toumey and the Wystrachs owned. However, the MeraBank officers have testified that this has not happened and MeraBank is currently pursuing these parties in a separate lawsuit. Subparagraph E states that the Bank may sell or dispose of the collateral and that whoever obtained title to the Notes would then own whatever interest Toumey and the Wystrachs owned. However, there has been no sale and, therefore, the Bank continues to hold the Notes as a security interest. The Notes provide that upon default the partnership interests may be sold and the investor would then be liable for any deficiency. Exhibit D, Plaintiff's Statement of Facts.

Plaintiff maintains that foreclosure is unnecessary. A.R.S. § 47–9502(A) explains the collection rights of a secured party:

When so agreed and in any event on default the secured party is entitled to

notify an account debtor or the obligor on an instrument to make payment to him whether or not the assignor was theretofore making collections on the collateral, and also to take control of any proceeds to which he is entitled under Section 47–9306.

Plaintiff argues that by suing on the notes it is taking action to make collection from the obligors.

Moreover, plaintiff argues that the loan documents do not prevent suit directly on the Notes. Plaintiff states that the Security Agreement simply provides that the bank *may* foreclose, as it is entitled to exercise all the rights and remedies available in the loan documents and in the U.C.C. Subparagraph D of the Security Agreement simply allows plaintiff the option to retain the collateral in satisfaction of the debt; subparagraph E allows plaintiff to accept a trade of property at any sale or disposition of the collateral. Neither provision limits plaintiff's remedies. Moreover, the RTC points out that a sale of the promissory notes would be fruitless, as there is no market for such instruments and defendants would likely still owe the full amount. Finally, plaintiff contends that the Investor Notes do not require that the interests be sold upon default, but give that option.

The court finds that plaintiff is not required to first foreclose on the promissory Notes. Defendants are unable to point to any statutory or contractual language that requires a sale, before plaintiff may institute an a collection action on the notes. It appears that foreclosure is simply an available option. Moreover, common sense dictates that foreclosure would be pointless and defendants would continue to be obligated for the full amount as a deficiency. Therefore, under A.R.S. § 47–9502, the court finds that the RTC has a right to sue defendants on the notes, rather than first foreclosing.

### 3. Fraud Defenses

Plaintiff moves for summary judgment, seeking a determination that the Notes are enforceable by the RTC free of any defenses raised by the investors. The RTC argues that the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e) preclude defendants from raising any defenses or counterclaims to the enforcement of the Notes.[1] Defendants seek to void their obligations, as they were allegedly procured through fraud, material misrepresentations and omissions about the financial condition of Hotel Park Tucson by Toumey and the Wystrachs. Plaintiff admits that there are no allegations that MeraBank participated in any alleged fraud.

#### a. *D'Oench, Duhme* Doctrine

Plaintiff argues that the *D'Oench, Duhme* doctrine, see *D'Oench, Duhme and Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), is a federal common law rule of estoppel, which precludes claims or defenses against FDIC, FSLIC and the RTC that are based upon unwritten agreements that were not reduced to writing and kept in the records of the failed institution. Included in the definition of an "agreement," plaintiff claims, are the types of false representations allegedly made by Toumey and the Wystrachs, inducing a maker to sign a promissory note. See *Langley v. FDIC*, 484 U.S. 86, 91–92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987).[2] Plaintiff asserts that the alleged misrepresentations were part of the agreement between the investors and Toumey, the Wystrachs and PTILP. Finally, plaintiff notes that the agreement was not in a writing which was in the bank's records and, obviously, such a scheme would have the effect of misleading banking authorities. See *D'Oench, Duhme*, 315 U.S. at 460–61, 62 S.Ct. at 680–81. Thus, the *D'Oench, Duhme* doctrine bars defendants from raising fraud as a defense.

Defendants interpret the doctrine more restrictively. Defendants argue that three

---

1. Plaintiff also argued that the federal holder in due course rule barred any fraud defenses. Plaintiff, however, withdrew this argument, but may raise it again in a subsequent motion.

2. Although *Langley* applied § 1823(e), *see supra*, the Court referred to its previous discussion of "secret agreement" in *D'Oench, Duhme*. *Langley*, 108 S.Ct. at 401–02.

elements must be met before the doctrine may be applied. First, the agreement must be "secret," not in the bank's files or apparent on the face of the instrument. *Id.* Second, the agreement must be one that effectively is "designed to deceive" the bank's creditors and examiners. *Id.* Third, the agreement must be between the maker and the bank, or at least involve the maker to such an extent that he is "len[ding] himself to a scheme" with the banker. *Id.*

The gist of defendants' argument is that the doctrine does not apply in the instant case, because the purpose and policy behind the doctrine would not be fulfilled. Where, as in the instant case, the party raising the fraud defense was not a party to the allegedly secret agreement and did not lend themselves to any scheme likely to deceive bank examiners, the doctrine does not apply. They argue that the investors in PTILP did not deal with any bank or bank officer; they did not lend themselves to any collusive arrangement with bank officers that would be likely to deceive any regulatory authority; they simply had no contact with MeraBank. Moreover, they assert that the alleged misrepresentations are not "side agreements," or part of a scheme "likely to deceive" bank examiners; the misrepresentations were made by the principals and partners of the limited partnerships; there were no indications, including in the Private Placement Memorandum, suggesting that the Notes would be assigned to a bank; and the investors executed U.C.C.-1's, which identified the partnership, not a bank, as the secured party. Defendants argue that the defenses arising from the partners' misrepresentations cannot be characterized as an agreement or arrangement likely to defraud bank examiners or creditors and, therefore, *D'Oench, Duhme* does not apply.

The court agrees with defendants' interpretation and application of *D'Oench, Duhme.* In *D'Oench, Duhme,* defendant, a brokerage firm, and bank officials secretly agreed that the firm's notes, given to the bank as part of a scheme to conceal the bank's investment in worthless bonds, would never be called. *D'Oench, Duhme,* 315 U.S. at 454, 62 S.Ct. at 678. When the bank failed and the FDIC sued on the notes, the firm raised the secret agreement as a defense. *Id.* The Supreme Court found that the purpose of § 12B of the Federal Reserve Act was to protect the FDIC and its public funds against misrepresentations as to the assets in the portfolios of the bank that the FDIC insures. *Id.* at 456–57, 62 S.Ct. at 679. The court stated that:

> [t]he test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent [the F.D.I.C.] relied in insuring the bank was or was likely to be misled.

*Id.* at 460, 62 S.Ct. at 681. The Court found that the borrower's "side agreement" defense was precluded, and stated:

> If the secret agreement were allowed as a defense in this case the maker of the note would be enabled to defeat the purpose of the statute by taking advantage of an undisclosed and fraudulent arrangement which the statute condemns and which the maker of the note made possible.

*Id.* at 461, 62 S.Ct. at 681.

 The purpose of the rule is to prevent collusion with bank officials in order to protect borrowers or third parties with favorable new terms or agreements and to ensure the ability of federal regulators to consider any loan transactions. *See Langley,* 108 S.Ct. at 401. Although the court is unable to find, as a matter of law, that the doctrine applies only to agreements between a borrower and a bank, *see FDIC v. Hoover–Morris Enterprises,* 642 F.2d 785 (5th Cir.1981),[3] the purposes of the doctrine

---

**3.** The unwritten side agreement was part of a note executed by a general partnership in favor of a mortgage corporation; the mortgage corporation later conveyed an interest in the note and deed of trust to a bank, which later became insolvent. The FDIC took over as receiver and then liquidator of the bank and later when the mortgage corporation became bankrupt, the re-

are not met by application to the instant facts. In *Hoover–Morris*, the court was not hesitant to apply both § 1823(e) and *D'Oench, Duhme*. However, the case may be distinguishable as the unwritten side agreement involved an accord and satisfaction, whereby the mortgage corporation agreed not to seek a deficiency—an agreement that was not fraudulent but would hamper the interests of the federal regulators. In the instant case, the investors were allegedly defrauded by general partners who later assigned their interests to the Bank. The alleged fraudulent misrepresentations were included in agreements between the investors and the principals. These agreements may be found later to be legitimate and potentially may not interfere with a bank's interests. There are no allegations that these investors participated in some scheme that later involved the Bank. The application of this doctrine in the instant case would not serve the policy behind the doctrine. *See also FDIC v. Meo*, 505 F.2d 790, 792–93 (9th Cir.1974) (*D'Oench, Duhme* not applicable to an innocent borrower who was not a party to any deceptive scheme.)

### b. 12 U.S.C. § 1823(e)

■ Plaintiff argues that the defendants' defenses and counterclaims are also statutorily barred by 12 U.S.C. § 1823(e).

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously,

maining interest was transferred to the FDIC.

from the time of its execution, an official record of the bank.

Defendants maintain that § 1823(e) is inapplicable. In *Langley*, although the Court found that the word "agreement" in the statute included fraudulent misrepresentations, it applied the statute when the misrepresentations were made by bank officers to borrowers. 108 S.Ct. at 401. The statute's language, defendants argue, is aimed at writings "executed by the bank ... contemporaneously with the acquisition of the asset by the bank ... approved by the board of directors of the bank or its loan committee, and ... continuously, from the time of its execution, an official record of the bank." Therefore, the statute cannot apply in the instant situation, where the notes were executed by limited partners in favor of a partnership that they were investing in. Defendants claim that the false representations and misleading statements included in the private placement memorandum, in violation of state and federal securities law, could never be "executed by the bank" and "approved by the board of directors," as no bank was involved. The Notes' makers had no dealings with the bank and, therefore, had no opportunity to fraudulently collude with bank employees to insert favorable new terms.

Plaintiff's retort is simply that the statute's language is clear and is not limited to agreements by bank officers. *See F.D.I.C. v. Hoover–Morris Enterprises*, 642 F.2d 785, 787 (5th Cir.1981) ("The language of the statute is all encompassing; any agreement is subject to the statute if it tends to defeat or diminish FDIC's rights in an asset purchased under authority of § 1823.").

Again, the court finds that the statute is inapplicable to the instant situation. The statute cannot be interpreted to preclude a defense based upon alleged misrepresentations made by a partnership's principals to investors, as a bank could not "execute[ ]" the representations, nor could the board of directors have an opportunity to approve of them. This situation is outside of the statute's scope.

*Hoover–Morris*, 642 F.2d at 786.

IT IS ORDERED denying plaintiff's motion for summary judgment.

IT IS FURTHER ORDERED denying defendants' cross-motion for summary judgment.

IT IS FINALLY ORDERED granting in part and denying in part defendant's cross-motion for partial summary judgment, consistent with the instant order.